In The Matter of Establishment Inspection of METRO–EAST MANUFAC-TURING COMPANY.

In The Matter of Establishment Inspection of CENTURY CASTING CORPORATION.

Nos. 80–2509, 80–2510.

United States Court of Appeals, Seventh Circuit.

Argued April 13, 1981.

Decided Aug. 3, 1981.

Charles I. Hadden, Washington, D. C., for appellant.

Robert D. Moran, Washington, D. C., for appellee.

Before CUMMINGS, Chief Judge, SWY-GERT, Senior Circuit Judge, and JAME-SON, Senior District Judge.*

JAMESON, District Judge.

The Secretary of Labor has appealed from two orders limiting the terms of inspection warrants issued by the Occupational Safety and Health Administration (OSHA) to preclude attaching personal sampling devices to employees of Metro-East Manufacturing Company and Century Casting Corporation.

*Factual and Procedural Background*

Century Casting Corporation (Century) is a foundry engaged in the making of brass and aluminum sand castings. Metro-East Manufacturing Company (Metro-East) is a foundry which makes aluminum, brass, bronze, and non-ferrous castings. Both companies are affiliates of Century Brass Works, Inc. The issues in the two cases are, in all material respects, identical.

On January 10, 1980, OSHA received a written complaint from an employee of Century, alleging that Century employees were suffering adverse health effects from breathing air which was "full of smoke and particles of contaminants." On February 20, 1980, OSHA received a complaint from an employee of Metro-East alleging similar unsafe and unhealthful working conditions.

After evaluating the complaints, OSHA instructed two compliance officers to conduct an industrial hygiene survey at each facility. They were denied permission to do so. OSHA then applied for inspection warrants pursuant to Sections 8(a) and (f) of the Occupational Health and Safety Act of 1970 (29 U.S.C. § 651 *et seq.*).[1] A warrant

was issued by a United States Magistrate on May 20 for inspection of Metro-East, and on May 30 for inspection of Century.[2]

On May 20, the compliance officers, Harold Pauly and Harold Carter, served the Metro-East warrant on Foundry Superintendent Meier. With the foreman and shop steward they conducted a preliminary or "walkaround" inspection of the facility. Pauly informed Meier that they intended to conduct an industrial hygiene survey by attaching personal sampling pumps to the employees' belts in order to determine employee exposure to air contaminants.[3] Meier informed Pauly that he would not permit air sampling requiring sampling devices to be attached to employees. This was considered a "denial of entry," and the compliance officers left the premises.

On the advice of the Regional Solicitor's office, the compliance officers obtained written authorization from nine employees and their union representative to use the sampling devices. The original warrant, accompanied by the letters of authorization, was again presented to Meier and the company's general manager, Charles Lenz, on May 28. The company officials informed the compliance officers that they still refused to permit personal sampling to be conducted. Their denial was based on legal advice received from the American Foundry Society.

On June 2, the compliance officers served the Century warrant on Charles Lenz in his capacity as general manager. Lenz refused to permit the inspection, taking the position that the warrant was invalid.

Both companies filed motions to quash the warrants. The Secretary moved to dismiss the motions to quash and petitioned

---

* The Honorable William J. Jameson, Senior District Judge of the District of Montana, is sitting by designation.

1. Both companies had informed the compliance officers that they desired to be represented at proceedings seeking a warrant. OSHA, however, applied for the warrants without notifying the companies, but did inform the magistrate of the companies' requests.

2. On May 20, OSHA had obtained a warrant authorizing inspection of Century Brass, Inc. After OSHA learned that the warrant was directed to the wrong company, it obtained the new warrant on May 30.

3. The pump is about the size of two cigarette packages, and has a tube attached. The device is affixed to an employee's clothing and measures the air contaminants to which the employee is exposed.

the court for an order to show cause why the companies should not be adjudged in civil contempt for failure to comply with the inspection warrants. Following briefing and without a hearing, the court found that the warrants were properly issued; granted the Secretary's motion to dismiss the motions to quash; denied the Secretary's motion to hold the companies in civil contempt; and ordered the companies to allow inspections "according to the Magistrate's warrant, with the limitation on attaching personal sampling devices to employees." The Secretary has appealed from the orders limiting the warrants.

*Applicable Statute and Regulations*

In enacting the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 *et seq.*), Congress declared "it to be its purpose and policy . . . to assure as far as possible every working man and woman in the Nation safe and healthful working conditions. . . ." 29 U.S.C. § 651(b). To "carry out the purposes" of the Act the Secretary of Labor is authorized

to inspect and investigate during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, any such place of employment and all pertinent conditions, structures, machines, apparatus, and materials therein, and to question privately any such employer, owner operator, agent or employee.

29 U.S.C. § 657(a)(2).

The Secretary of Labor and the Secretary of Health, Education and Welfare are empowered to prescribe rules and regulations each deems necessary to carry out his responsibilities under the Act, "including rules and regulations dealing with the inspection of an employer's establishment." 29 U.S.C. § 657(g)(2). Pursuant to this rulemaking authority OSHA promulgated regulations, including 29 C.F.R. § 1903.7, entitled "Conduct inspections," which authorizes OSHA officers "to take environmental samples" and "to employ reasonable

investigative techniques" in making their inspections.

Following the promulgation of regulations, the Secretary issued a Compliance Operations Manual. Both the initial Manual and the Field Operations Manual which replaced it provide for measuring exposure to air contaminants by personal sampling devices wherever possible. The current Industrial Hygiene Field Operations Manual also specifies that personal sampling is the standard method for measuring air contaminants and that breathing zone samples are required to determine compliance with air quality standards.[4]

*Contentions of Parties*

In contending that the district court erred in limiting the Secretary's authority to conduct personal sampling under the warrants, the Secretary recognizes that "the Secretary's legislative rule does not specify the use of personal sampling." He argues, however, that the regulation authorizing OSHA compliance officers "to take environmental samples" through "reasonable investigative techniques" (29 C.F.R. § 1903.7(b)) clearly authorizes the use of personal sampling, and that "the Secretary's manuals, Federal Register statements, and practice in the field establish that he has always interpreted § 1903.7 to authorize the use of personal sampling devices."

On the other hand, the two companies contend that there is no existing rule or regulation authorizing the use of personal sampling devices, nor statutory authority for such a rule; that the district court had no statutory or inherent power to order an employer to attach sampling devices to its employees; and that even if the Secretary's interpretation of the regulation were to be held reasonable, the regulation fails to give "fair warning" that an employer must allow his employees to wear personal sampling devices.

4. The Manual states that the "most satisfactory" method of testing air samples is the "use of a personal sampler," but recognized that other methods are also available.

*Discussion*

In limiting the inspection warrants to preclude attaching personal sampling devices to employees, the district court relied upon *Plum Creek Lumber Co. v. Hutton,* 608 F.2d 1283 (9 Cir. 1979), aff'g 452 F.Supp. 575 (D.Mont.1978). The court said in part:

> There, the Court held that the All Writs Act does "not authorize a Court to order a party to bear risks not otherwise demanded by law, or to aid the government in conducting a more efficient investigation, when other forms are available." *Plum Creek, supra,* at 1290. The Court refused to order Plum Creek Lumber to rescind its policy forbidding employees from wearing OSHA sampling devices. It reasoned that the devices, although admittedly inferior to other sampling techniques, imposed additional risk of injury for which OSHA would not take responsibility. Without statutory or inherent authority to do so, the Court refused to order the company to bear this additional risk. Likewise, this Court will not order respondent to accept additional risks by forcing it to permit OSHA to attach personal sampling devices to its employees.

In *Plum Creek,* the company was engaged in operations involving the use of noisy machinery and processes which resulted in formaldehyde fumes. OSHA procured search warrants to conduct inspections to determine whether exposure to the noise and/or fumes would have adverse effects on the employees. In the course of the inspection OSHA requested the employees to wear personal sampling devices. The company posted a notice notifying its employees of its policy against the use of personal sampling devices, and most of the employees refused to wear them. As a result OSHA's tests were inconclusive. The complaint and cross-complaint in a subsequent action presented the question of whether Plum Creek had a right to forbid its employees from wearing the testing devices.

The district court found from the evidence that it was "very questionable whether the wearing of the devices involved actually created a safety hazard," but that "any device attached to the body may possibly be caught by moving machinery, and there was evidence that any such device could distract an employee's attention from moving machinery." 452 F.Supp. at 576. The court noted that it did not appear "that the devices employed are specified by law, or by the regulations," and that while they had been "approved by OSHA inspectors and perhaps by their superiors," they were "not required by statute or regulations." *Id.*

Although the court found that "the testing devices are valuable tools" and the "use of them would be reasonable," the court concluded that OSHA inspectors did not have a right to require that Plum Creek permit its employees to wear the sampling devices. The court said in part:

> Plum Creek is a private employer. It bears all safety risks. The safety factor cannot be eliminated. Plum Creek pays the costs of all industrial accidents. OSHA cannot guarantee that these devices would cause none. Plum Creek might be required by law to accept the minimal risk and to permit the requested sampling, but in the absence of law the OSHA inspectors have no power to make Plum Creek do something simply because the inspectors think it reasonable, and the fact that the court agrees with the inspectors adds neither to OSHA's power nor to the court's.

*Id.* at 577.

On appeal the issue was "whether the district court has the power to order an employer to rescind its policy of forbidding employees to wear OSHA air-quality and noise-testing devices." It was OSHA's position that the court had the power to enjoin Plum Creek from enforcing its policy pursuant to the All Writs Act, 28 U.S.C. § 1651(a).[5] This act had been construed in

---

5. The All Writs Act provides: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and

*United States v. New York Telephone Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), to empower the court to order a private party (phone company) to provide assistance to the FBI in conducting a search. The court distinguished that case, however:

> The All Writs Act, read with the *New York Telephone* gloss, permits the district court, in aid of a valid warrant, to order a third party to provide nonburdensome technical assistance to law enforcement officers. It does not give the district court a roving commission to order a party subject to an investigation to accept additional risks at the bidding of OSHA inspectors. There is evidence that use of the devices attached to the bodies of the employees is a much more efficient method of sampling, but in the absence of law specifying their use, we cannot order Plum Creek to bear the added risks the devices would bring.

608 F.2d at 1289.

Having concluded the All Writs Act did not authorize the court to order a private party to assume additional risks the court also found that the district court lacked the inherent authority to order Plum Creek to permit its employees to wear the testing devices. *Id.* at 1290.

In two recent cases district courts declined to follow *Plum Creek.* In *Marshall v. Rochester Shoe Tree Co., Inc.,* (Misc. 306) (N.D.N.Y. April 4, 1981), the court said in part: "The Court does not share the position of the Ninth Circuit. Not only is such a mode of inspection reasonable under the circumstances presented here, but also there is no allegation that any tests would jeopardize the safety of the employees."

*In the Matter of the Inspection of: Cleveland Electric Illumination Company,* No. M80–2128 (N.D. Ohio, Feb. 27, 1981), involved air sampling devices similar to those involved here and in *Plum Creek.* After referring to testimony of an OSHA

Industrial Hygienic Supervisor that the use of these devices is "the only method that can be used to get the most accurate samples" and to the testimony of another supervisor that he had applied about 1,500 devices and did not know of any accidents, the court said:

> The court in Plum Creek noted two other available methods of testing. However, this court has heard testimony that these methods are not nearly as efficient as the air sampling devices. If an employee feels that the device may hinder his ability to perform his work in a safe manner he may refuse to wear it.[6]

All of the courts, including *Plum Creek,* have found that the use of the personal sampling device may be found to be "reasonable," although in *Plum Creek* this conclusion was qualified by the holding that their use would be reasonable if required by statute or regulation. There is disagreement with respect to possible "safety risks" in the use of the personal sampling device. Recognizing that the risks are minimal, the courts in *Plum Creek* concluded, however, that the safety factor could not be eliminated. They recognized that an employer might be required by statute or regulation to permit the requested sampling, but held that in the absence of statutory law or regulations, neither OSHA nor the courts can order an employer to "bear the added risks the devices would bring."

In all of the foregoing cases evidence was presented with respect to the safety risks of the sampling devices. As noted above, here the motions were submitted on briefs without a hearing. No discovery was conducted and no affidavits were filed regarding the safety factors considered by the other courts. The district court was not accordingly in a position to make specific findings on the safety risks. Rather, relying on *Plum Creek,* the court concluded that it would not order the employers "to accept additional risks by forcing [them] to permit

---

agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

6. This court has been advised by counsel that an appeal has been taken from *Cleveland Electric Illumination Company* to the Sixth Circuit Court of Appeals.

OSHA to attach personal devices to [their] employees." The record before this court with respect to the extent of any "safety risks" in the use of the devices is limited to the decisions of other courts and representations of counsel for the respective parties.

It is conceded that neither the statute nor the regulation issued by OSHA expressly provided for the use of personal sampling devices. The Secretary, of course, takes the position that the use of the device is "reasonable" and that it is clear from the manuals,[7] statements in the Federal Register,[8] and practice in the field that he has always interpreted the regulation to permit the use of the sampling device. No effort has been made to adopt a supplemental rule to authorize their use, although *Plum Creek* was decided by the district court in June of 1978 and by the Court of Appeals in November, 1979.

The employers present an argument not considered by the other courts which have considered the propriety of the use of personal sampling devices, i. e., assuming that the Secretary's interpretation of the regulation is "reasonable", it still does not give "fair warning" of what is required or prohibited by the regulation; therefore, imposition of any penalty would violate due process. "[I]f a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express." *Marshall v. Anaconda Co.,* 596 F.2d 370, 376 (9 Cir. 1979); citing *Diamond Roofing Co. v. OSHRC,* 528 F.2d 645, 649 (5 Cir. 1976). In *Diamond Roofing* the court said further:

> An employer . . . is entitled to fair notice in dealing with his government. Like

other statutes and regulations which allow monetary penalties against those who violate them, an occupational safety and health standard must give an employer fair warning of the conduct it prohibits or requires, and it must provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents.[9]

*Id.* at 649.

This court has recognized that as a general rule the courts must defer to the Secretary's interpretation of the statute and regulations "if that interpretation is a reasonable one even though some other interpretation would be more reasonable." See, *e. g., Langer Roof & Sheet Metal v. Secretary of Labor, etc.,* 524 F.2d 1337, 1338 (7 Cir. 1975). On the other hand, it is also true that

> The responsibility to promulgate clear and unambiguous standards is upon the Secretary. The test is not what he might possibly have intended, but what he said. If the language is faulty, the Secretary has the means and obligation to amend.

*Marshall v. Anaconda Co.,* 596 F.2d 370, 377 n.6 (9 Cir. 1979); citing *Bethlehem Steel Corp. v. OSHRC,* 573 F.2d 157 (3 Cir. 1978). We recognize that in those cases the question was which of two possible meanings should be given the language of a regulation; but we think the same rationale applies when the issue is the permissible scope of a regulation authorizing "reasonable investigative techniques."

In the present cases OSHA sought civil contempt sanctions against the employers for failing to permit investigations

---

7. The Secretary recognizes that the manual is not a regulation and has no legal or binding force. See, *e. g., Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981).

8. The Secretary calls attention to the preamble to the standard regulating exposure to coke oven emissions (29 C.F.R. § 1910.1029) that "[i]t is OSHA policy to monitor exposures by taking personal samples, whenever possible." The employers suggest that the Secretary's specific inclusion of this provision for inspec-

tion of coke oven emissions shows that the Secretary "knows how to select language to clearly accomplish that goal," paraphrasing this court's statement in *Anning-Johnson Company v. OSAHRC,* 516 F.2d 1081, 1086 (7 Cir. 1975).

9. 29 U.S.C. § 657(d) provides that "[a]ny information obtained [in an investigation] shall be obtained with a minimum burden on employers. . . ." Similarly, the regulations provide that any inspection must not unreasonably disrupt work operations. 29 C.F.R. § 1903.7(d).

using personal sampling devices. Yet nowhere in the applicable regulations is the use of personal sampling devices identified as a "reasonable" investigative technique. "[T]he Secretary as enforcer of the Act has the responsibility to state with ascertainable certainty what is meant by the standards he has promulgated." *Diamond Roofing, supra*, 528 F.2d at 649. As the cases cited by the parties indicate, the scope of OSHA's authority is continually under attack. It would impose no hardship on the Secretary to amend the rules to give "fair warning" of the types of investigation deemed "reasonable".

In the recent case of *American Textile Manufacturers Institute, Inc. v. Donovan*, —— U.S. ——, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981), the court rejected a provision in a "Cotton Dust Standard," [10] that the employer give employees unable to wear a respirator the opportunity to transfer to another position, if available, without loss of wages. The Court concluded that the agency had failed "to make the necessary determination or statement of reasons that its wage guarantee requirement is related to the achievement of a safe and healthful work environment" and that "OSHA acted beyond statutory authority when it issued the wage guarantee regulation." *Id.* at ——, 101 S.Ct. at 2505, 2506.

Moreover, in *American Textile*, the Court was construing a Standard promulgated after full compliance with the informal rulemaking procedure prescribed by the Act. See 29 U.S.C. § 655(b)(2), (3), (4).[11] The Court there noted that the method OSHA develops for dealing with occupational safe-

ty and health problems "must be justified on their relationship to safety or health." The Standard itself contained specific and detailed provisions with respect to the use of respirators by employees. Here it is conceded that the Standard or regulation, made no specific reference to the use of personal sampling. The affected parties were given no opportunity to comment on a proposed regulation, and OSHA made no determination or statement of its reasons for requiring the use of the sampling device.

While a debatable question is presented, we conclude that the district court could properly follow the finding and conclusions in *Plum Creek*, particularly in view of the vagueness of the term "reasonable investigative technique," the fact that no evidence was presented with respect to the safety factors involved in the use of the personal sampling device, and no effort was made to amend the regulation following the decision in *Plum Creek*. The Secretary argues, however, that *Plum Creek* was not only wrongly decided but also is distinguishable because in that case the Secretary was seeking the rescission of Plum Creek's policy prohibiting employee cooperation with OSHA sampling and here neither company "has adopted a policy forbidding employee cooperation." While in these cases there was no "posted policy," it is clear that each company was opposed to the use of the personal sampling device, and from the outset contended that OSHA did not have the authority to compel them to require employees to use the device.[12] Both were acting on the advice of the American Foundry Society, whose members obviously had a

---

10. The Court upheld other provisions of the Standard over the objection of petitioner that the Occupational and Safety Health Act required OSHA to demonstrate that its Standard reflected a reasonable relationship between the costs and benefits associated with the Standard.

11. The court noted that the widespread public participation through written comments and 14 days of hearings before the Standard was promulgated, the "voluminous record" totaling some 105,000 pages, and the detailed statement of findings and reasons.

12. It is true that apparently the employees took a different position in the respective cases. In *Plum Creek* 16 of 20 employees refused to wear the devices "and most based their refusal upon the fact that company policy forbade it. Four employees did wear the devices, and there was no proved retaliation." 452 F.Supp. at 576. Here, nine Metro-East employees signed statements at OSHA's request that they would have "no objection to wearing a personal sampling pump." No employee of Century signed such a statement or otherwise agreed to wear the device.

"policy" against the use of personal sampling. We cannot agree with the Secretary that any difference between the situation in *Plum Creek* and these cases would require a different result. As noted above, since *Plum Creek* was decided the Secretary has had ample opportunity to amend the Standard to clarify its meaning and give fair warning of the type of investigation deemed reasonable.[13]

Affirmed.

SWYGERT, Senior Circuit Judge, dissenting.

I, and apparently the majority and every court that has considered the issue, agree that the use of personal sampling devices is reasonable. The majority, however, believes that the "reasonable investigative technique" language of 29 C.F.R. § 1903.7 fails to give fair warning of whether personal sampling devices are included. I cannot agree.

There is no evidence here that personal sampling is a more dangerous, intrusive, or otherwise unreasonable investigative technique than others. It seems to me, for example, that an employee would be safer wearing the sampling device than if instead an OSHA official wore the device and hovered nearby, attempting to duplicate that employee's work experience. In fact, the only evidence I have seen referred to in the cases discussed by the majority demonstrates that personal sampling differs from other techniques in only one major respect—it is more efficient.

Nonetheless, the majority concludes that the Secretary has not stated with "ascertainable certainty" what is meant by the regulation he has promulgated. *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976). I fail to see the uncertainty. As the majority itself notes, the express purpose of the Act was to assure "as far as possible" a safe and healthful working environment, 29 U.S.C. § 651(b); the Secretary of Labor is explicitly empowered to make reasonable inspections and investi-

gations of places of employment and "all pertinent conditions" therein, 29 U.S.C. § 657(a). Pursuant to his statutory authority, the Secretary has promulgated 29 C.F.R. § 1903.7, which authorizes OSHA employees to "take environmental samples" and "employ reasonable investigative techniques." There is, as the majority concedes, no potential double meanings in the language of the regulation as there was in the cases on which they rely. Moreover, the statutory concern with "as far as possible" ensuring a healthful work environment makes it not in the least uncertain that personal sampling devices used to measure the breathing zone of employees are within the scope of a regulation authorizing "reasonable investigative techniques."

It is undisputed that for almost ten years the Secretary has interpreted the regulation to authorize the use of personal sampling devices. Giving deference to OSHA's consistent interpretation, the majority could have held that OSHA has the authority to permit employees to wear personal sampling devices, even with the "fair warning" problem they but not I discern. The employers here have not been held in civil contempt and prospective application would not therefore offend due process:

> It is axiomatic that defects in the constitutional sufficiency of a regulatory warning may be cured by authoritative interpretations which clarify obscurities or resolve ambiguities. Once such a construction has been provided, wholly prospective application of the rule thus established does not offend due process since the interpretive decision itself provides the requisite warning.

*Diebold, Inc. v. Marshall*, 585 F.2d 1327, 1338 (6th Cir. 1978).

I would reverse the judgment of the district court.

---

13. Our holding does not, of course, preclude the use of the personal sampling devices by

OSHA's own employees during their inspections.